**United States District Court**
**District of Massachusetts**

```
_____
                                )
JOHN DOE,                       )
                                )
          Plaintiff,            )
                                )
          v.                    )     Civil Action No.
                                )     18-12547-NMG
LINDA SPEARS, in her official   )
and individual capacity,        )
PATRICIA KELLY, in her official )
and individual capacity, JUDITH )
EDWARDS, in her official and    )
individual capacity,            )
                                )
          Defendants.           )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises from a family law dispute in which
employees of the Massachusetts Department of Children and
Families ("the DCF") temporarily removed three minor children
(identified as "A", "B" and "C" in the amended complaint) from
the residence of the anonymous plaintiff who is their father
(identified as "D" or "Dad" in the amended complaint).
Plaintiff claims that Linda Spears, the Commissioner of the DCF
("Commissioner Spears"), Patricia Kelly, a social worker
employed by the DCF ("Kelly") and Judith Edwards, Kelly's
supervisor ("Edwards") (collectively "defendants") have, <u>inter
alia</u>, intentionally violated his and his children's

constitutional rights to liberty, freedom of association and familial integrity by separating him from his children without just cause or due process of law during the course of an investigation into allegations of child abuse.

Before this Court is defendants' motion to dismiss for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, this Court concludes that plaintiff's claims are barred by sovereign immunity, qualified immunity and the Rooker-Feldman doctrine and otherwise lack merit.[1]

## I.   **Background**

### A.   **Facts**

The pro se plaintiff is the father of "A", "B" and "C" who, when the relevant child abuse investigation first began, were 14, 12 and 9 years old, respectively. Until December, 2014, the three minor children lived with plaintiff. He alleges that he and the children's mother were divorced and that she was not materially involved in the children's lives but did have visitation rights.

---

[1] Even if plaintiff could state a viable claim for relief, this Court would dismiss the amended complaint for failure to comply with the pleading requirements of Fed. R. Civ. P. 10(a). Id. ("Every pleading **shall . . . include the names of all the parties** . . . ." (emphasis added)); see also Doe v. Bell Atl. Bus. Sys. Servs., Inc., 162 F.R.D. 418, 422 (D. Mass. 1995) ("In the civil context, the plaintiff instigates the action, and, except in the most exceptional cases, must be prepared to proceed on the public record."). The plaintiff here did not seek leave of Court to proceed under a pseudonym.

In October, 2014, plaintiff received a call from Kelly (a social worker employed with the DCF) asking if she could meet with him and the children at his residence.  In early November, 2014, Kelly came to the residence and spoke with each child individually.  She also spoke to plaintiff for about 30 minutes and during that conversation he learned that before the visit Kelly had met with the children's mother several times.  She also informed "D" that she was investigating an allegation that he had recently slapped and kicked "C", the youngest child. Plaintiff immediately denied the allegation.  He explained that "C" had a history of becoming physically aggressive and throwing tantrums and that on the date in question, "C" had become physically violent towards the family dog and his older brother, "B", and that plaintiff had grabbed him by the wrist and taken him to his room to calm down.  Plaintiff alleges that there were never any bruises or markings on "C" or any of the other children.  Kelly told plaintiff, however, that "A", the oldest child, confirmed that plaintiff had hit "C" in the face.

Plaintiff contends that "C"'s mother prompted "C" to make up the story of physical abuse which was then reported to the DCF.  He also asserts that "A" was lying because he was a teenage boy rebelling against his father.  He submits that during "B"'s interview with Kelly, "B" told her that the

allegations of abuse were false and that his father had not hit "C" or either of the other children.

After Kelly left the home, neither he nor his children had any contact with the DCF for more than a month. In early December, 2014, Kelly called plaintiff at his work and told him that the three children were being removed from his house and placed in DCF custody and that he was prohibited from contacting them. The next day, plaintiff was informed that he had a right to a "72-hour hearing" (a hearing to determine whether there was sufficient evidence to support temporary removal) which was scheduled for the following week. He received a copy of a "petition" filed by the DCF with the Juvenile Court alleging that plaintiff had abused C by slapping and kicking him. The petition contained no allegations of physical abuse as to "A" or "B".

Plaintiff alleges that defendants coached the children to testify against him at the 72-hour hearing and that the Judge at the hearing did not permit plaintiff to be present or to cross-examine his children. He alleges, nevertheless, that his children testified that they were not afraid of their father and had not been physically abused. During the proceedings, Edwards also testified that

> she knew nothing about the case and simply deferred all questions to be asked of Defendant Kelly who was "on vacation" and never testified.

-4-

In January, 2015, the Juvenile Court determined that the
DCF had satisfied its burden of proof and the children were
temporarily placed in the custody of their mother.  The DCF and
the Juvenile Court allegedly never inquired into whether the
mother was fit to care for the children.  Plaintiff alleges that
he was thereafter prevented by defendants from seeing or
communicating with his children for "almost 500 days" despite
being afforded restricted visitation rights by the Juvenile
Court.  He claims that on numerous occasions Kelly informed him
that his children did not want to see him when, in fact, they
did want to see him or they were already visiting with plaintiff
surreptitiously.  He specifies two such occasions in July, 2015,
and July, 2018, when Kelly had emailed plaintiff regarding
visitation with his children.  Plaintiff alleges that throughout
this period of separation, he was able to see and communicate
with his children but only surreptitiously.

Plaintiff alleges that during the period of separation,
defendants submitted false reports to the Juvenile Court as to
the children's health and well-being and their desire to see
their father.  He alleges that in October, 2015, the DCF
reported that "A" was doing well academically and was happy but
he dropped out of high school shortly thereafter.  In November,
2015, the DCF allegedly submitted a false report notifying the
court that plaintiff's therapist had concluded that plaintiff

was unfit to see his children.  In June, 2016, plaintiff's therapist testified in court that he had never made any such statement about plaintiff.

Plaintiff alleges that

[i]n February of 2016, Defendant DCF ostensibly closed its case on the children and the family . . . [and] [i]n March of 2016, the Probate court dismissed Defendant DCF from the case.

Elsewhere in the complaint, however, plaintiff alleges that the DCF was involved in his children's lives as recently as July, 2018, and thus it is unclear exactly when, and if, the proceedings in the Juvenile Court and the DCF's involvement with plaintiff and his children were terminated.  He also alleges that he and his children have since been reunited but does not specify when that reunification occurred or whether his involvement with his children is in any way restricted by order of the Juvenile Court.

**B.   Procedural History**

In December, 2018, plaintiff filed the complaint with this Court as well as a sealed motion to impound and seal the information contained in the complaint.  Shortly thereafter, plaintiff filed an amended complaint.[2]

Plaintiff asserts sixteen claims against defendants, in both their official and individual capacities, for the

---

[2] The motion to impound and seal was filed only with respect to the original complaint and thus is moot in light of the filing of the amended complaint.

following: 1) declaratory judgment that the "DCF and the other defendants have waived their qualified immunity and are held liable under the Federal laws" (Count I); 2) injunctive relief to prevent defendants and their agents "from acting to interfere with the rights of Dad, and from retaliating against Dad for bringing this action" (Count II); 3) various constitutional violations (including violations of the First, Fifth and Fourteenth Amendments to the United States Constitution) under 42 U.S.C. § 1983 (Counts III, IV, V and VII); 4) "Waiver of the 11th Immunity" (Count VI); 5) attorneys' fees and expert fees pursuant to 42 U.S.C. § 1988 (Count VIII); 6) violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count IX); 7) violation of the Massachusetts Torts Claims Act ("the MTCA"), M.G.L. c. 258, § 2 (Count X); 8) violation of M.G.L. c. 119, § 29C (Count XI); 9) fraud and misrepresentation (Count XII); and 10) intentional infliction of emotional distress (Counts XIII, XIV, XV and XVI).[3]

Plaintiff seeks significant damages for the allegedly severe physical, mental, emotional and economic harm that he and his children suffered as a result of defendants' wrongful

---

[3] Counts III, IV and V assert claims directly under the First, Fifth and Fourteenth Amendments but they are construed by the Court as claims brought under § 1983. See Tomaselli v. Beaulieu, 967 F. Supp. 2d 423, 433 n.3 (D. Mass. 2013). Count VI asserts a legal argument that defendants have waived their Eleventh Amendment sovereign immunity by accepting federal funds but seeks no relief and will therefore be dismissed for failure to state a claim.

conduct, including 1) irreparable harm to the parent-child relationship, 2) development of medical and mental issues, including depression, anxiety and drug use, and 3) loss of family, friends and business.

In January, 2019, defendants filed a motion to dismiss the amended complaint, asserting that plaintiff's claims are barred by various immunity doctrines and otherwise lack merit.

## II.   Defendants' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim

### A.   Legal Standard

A plaintiff faced with a motion to dismiss under Fed. R. Civ. P. 12(b)(1) bears the burden of establishing that the court has subject matter jurisdiction over the action. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  If the defendant mounts a "sufficiency challenge", the court will assess the sufficiency of the plaintiff's jurisdictional allegations by construing the complaint liberally, treating all well-pled facts as true and drawing all reasonable inferences in the plaintiff's favor. Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).

If the defendant advances a "factual challenge" by controverting the accuracy, rather than the sufficiency, of the alleged jurisdictional facts, "the plaintiff's jurisdictional averments are entitled to no presumptive weight" and the court

will consider the allegations of both parties and resolve the factual disputes. Id.  The court has "broad authority" in conducting the inquiry and can, in its discretion, order discovery, consider extrinsic evidence or hold evidentiary hearings in determining its own jurisdiction. Id. at 363-64.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. Nollet v. Justices of Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  Although a court must accept as true all of the factual allegations contained in a complaint, that doctrine is not applicable to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662 (2009).

**B.   Sovereign Immunity**

Sovereign immunity bars suits for damages in federal court against the Commonwealth of Massachusetts, state agencies or state officials acting in their official capacities unless the Commonwealth has waived its sovereign immunity or Congress has abrogated it. Kentucky v. Graham, 473 U.S. 159, 165-67 (1985). Congress has not abrogated the states' sovereign immunity under § 1983. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" and thus Congress did not override states' sovereign immunity in enacting that provision).  The mere receipt of federal funds does not constitute a waiver of sovereign immunity unless Congress has explicitly conditioned the receipt of federal funds on such waiver and the State has nevertheless accepted those funds. Edelman v. Jordan, 415 U.S. 651, 673-74 (1974).

Nor has Massachusetts waived its sovereign immunity with respect to intentional tort claims under the MTCA. See Wilmot v. Tracey, 938 F. Supp. 2d 116, 143 (D. Mass. 2013) (explaining that "under Section 10(c) of the MTCA, public employees remain immune from any claim arising out of an intentional tort . . . [and thus plaintiff] cannot maintain a claim against the DCF for intentional infliction of emotional distress." (internal quotation marks omitted)); M.G.L. c. 258, § 10(c) (listing

-10-

misrepresentation and deceit as examples of intentional torts for which public employees remain immune under the MTCA).

Insofar as plaintiff sues defendants, who are employees of a state agency, in their official capacities for money damages for civil rights violations under federal law or for fraud and intentional infliction of emotional distress under state law, those actions are treated as suits against the Commonwealth itself and thus are barred by the doctrine of sovereign immunity. Moreover, to the extent that plaintiff seeks to compel the DCF or the Juvenile Court to comply with M.G.L. c. 119, § 29C (which requires the DCF to make reasonable efforts prior to removing the child from the home to prevent or eliminate the need for such removal) or seeks damages for an alleged violation thereof, those claims are also barred by sovereign immunity. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105-06 (1984) (holding that sovereign immunity bars an individual from suing a state official either for prospective or retroactive relief on the basis of state law). The claims against defendants in their official capacities and Count X under the MTCA will therefore be dismissed.

### C.   Qualified Immunity

Even where a government official does not enjoy sovereign immunity, he or she may still benefit from qualified immunity

when engaged in the performance of a discretionary function. <u>See</u>
<u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800, 817-18 (1982).

> [Q]ualified immunity protects government officials
> from liability for civil damages insofar as their
> conduct does not violate clearly established statutory
> or constitutional rights of which a reasonable person
> would have known.

<u>Pearson</u> v. <u>Callahan</u>, 555 U.S. 223, 231 (2009) (internal
quotation marks omitted) (quoting <u>Harlow</u>, 457 U.S. at 818).
Qualified immunity is applicable unless the official violated a
constitutional right that was clearly established at the time of
the alleged misconduct. <u>Id.</u> at 232 (citing <u>Anderson</u> v.
<u>Creighton</u>, 483 U.S. 635, 640 (1987)); <u>see also</u> <u>Malley</u> v. <u>Briggs</u>,
475 U.S. 335, 341 (1986) (commenting that the doctrine of
qualified immunity "provides ample protection to all but the
plainly incompetent or those who knowingly violate the law").
The First Circuit Court of Appeals has held that social workers
employed by the government and other government employees and
contractors may raise qualified immunity as a defense to a
§ 1983 suit for conduct arising out of a child abuse
investigation. <u>See</u> <u>Kauch</u> v. <u>Dep't for Children, Youth & their</u>
<u>Families</u>, 321 F.3d 1, 4 (1st Cir. 2003); <u>Frazier</u> v. <u>Bailey</u>, 957
F.2d 920, (1st Cir. 1992).[4]

---

[4] Defendants contend that social workers enjoy absolute immunity but the First
Circuit has not expressly so held.

Plaintiff alleges that defendants violated his First and Fourteenth Amendment rights to freedom of speech and freedom of association and his Fifth and Fourteenth Amendment rights to due process by interfering with his relationship with his children. While there is certainly a constitutionally protected right to the parent-child relationship, the exact contours of that right are unclear. See Frazier, 957 F.2d at 929-30 ("The [Supreme] Court . . . has never recognized the right to familial integrity as absolute or unqualified.  Within a family itself resides the sometimes competing interests of a parent's right to rear his or her child and the fundamental rights of that child." (internal citations omitted)).  Moreover, there is no constitutional right to be free from child abuse investigations. Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993) (citing Stanley v. Illinois, 405 U.S. 645, 649 (1972)).

Based on the facts alleged in the amended complaint, Kelly had cause to believe that "C" had been physically abused and thus had reason to investigate potential child abuse with respect to all three children.  Moreover, the Juvenile Court ultimately determined that the DCF had sufficient cause to remove temporarily all three children from plaintiff's home and to restrict his visitation rights.  The mere investigation of allegations of child abuse and removal of the children from his custody does not violate a clearly established constitutional

-13-

right even if the investigation is not perfect. See Wilmot, 938 F. Supp. 2d at 138-39 (granting qualified immunity to DCF social workers regardless of whether "their suspicion was ultimately determined to be unfounded or that they were perhaps overzealous in their investigation" (internal quotation marks omitted) (quoting Hopkins v. Rhode Island, 491 F. Supp. 2d 266, 273-74 (D.R.I. 2007))); see also Watterson, 987 F.2d at 8-9; Frazier, 957 F.2d at 930-31.

Furthermore, neither Commissioner Spears nor Edwards can be held liable for Kelly's conduct under a theory of respondeat superior and plaintiff has alleged no conduct specific to Commissioner Spears or Edwards sufficient to hold them personally liable. Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005).  Plaintiff's constitutional claims against defendants in their individual capacities for violation of his rights to freedom of association and the parent-child relationship will be dismissed.

To the extent that plaintiff is suing the defendants in their individual capacities for fraud and for intentional infliction of emotional distress under Massachusetts law, those claims are barred by the common law of qualified immunity. See Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 145-46 (1st Cir. 2016) (discussing how, in affirming dismissal of an intentional tort claim, "a public official, exercising judgment

and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption"); Summers v. City of Fitchburg, No. 15-cv-13358-DJC, 2016 WL 4926415, at *5 (D. Mass. Sept. 15, 2016) ("Under Massachusetts common law, government employees acting within their discretion as public officials and in good faith are shielded from liability" for intentional tort claims). Generalized and conclusory allegations of bad faith or malice are insufficient to overcome the presumption that government employees acted in good faith and thus are entitled to qualified immunity under Massachusetts common law. See Najas, 821 F.3d at 146; Summers, 2016 WL 4926415, at 5.

Plaintiff makes no non-conclusory allegations to suggest that any of the individual defendants acted maliciously or in bad faith. With respect to the claim for fraud and misrepresentation, plaintiff alleges that

> Defendants have committed fraud upon the Plaintiffs by
> misrepresenting their true intentions, and by failing
> to disclose what their true goals was, which was to
> separate the children from their father causing
> injury . . . .

He claims that the defendants or the DCF, collectively, lied to him and to the Court on several occasions about the health and well-being of his children. By failing to specify which of the individual defendants made the allegedly false or misleading

-15-

statement or how he relied upon those statements to his
detriment, plaintiff has failed to comply with the pleading
requirements of Fed. R. Civ. P. 9(b).  Id. (requiring that the
circumstances constituting fraud be stated with particularity).
As for the allegations of fraud specifically attributed to Kelly
(that she told plaintiff that his children did not want to see
him), he asserts no facts to indicate that Kelly acted in bad
faith for the purpose of interfering with the parent-child
relationship rather than in good faith on the belief that it was
in the children's best interests not to see their father.   In
addition to finding that qualified immunity applies to the claim
for fraud and misrepresentation, the Court also concludes that
plaintiff has failed to state a claim for fraud because he has
failed adequately to plead reliance or injury.   Indeed, despite
Kelly's statement that plaintiff's children did not want to see
him, he managed to visit and communicate with them
surreptitiously.

     With respect to the claims for intentional infliction of
emotional distress, plaintiff merely states that

> Defendants intended to inflict emotional distress or
> knew or should have known that emotional distress was
> the likely result of their conduct . . . [and that
> their] conduct was extreme and outrageous, was beyond
> all possible bounds of human decency and was utterly
> intolerable in a civilized community.

In addition to merely reciting the elements of the cause of
action (which is insufficient under Fed. R. Civ. P. 12(b)(6)),
see Iqbal, 556 U.S. at 678, plaintiff also provides no facts to
support his claim that defendants maliciously or in bad faith
intended to cause severe emotional distress to plaintiff and his
children. See Wilmot, 938 F. Supp. 2d at 143-44 (dismissing
claims for intentional infliction of emotional distress where
the defendant social workers were merely carrying out their
duties in investigating allegations of child abuse).  While the
Court sympathizes with plaintiff's deprivation, any emotional
harm caused to him or to his children was the product of an
investigation of child abuse and subsequent court proceedings
for which the Juvenile Court apparently determined the DCF had
cause to initiate.  The Court has no reason to disregard the
presumption that those proceedings were conducted in good faith
by the DCF and defendants.

     The Massachusetts common law of qualified immunity
therefore applies to plaintiff's claims for fraud and for
intentional infliction of emotional distress and those claims
will be dismissed.

     D.  **Rooker-Feldman Doctrine**

     In addition to plaintiff's constitutional claims for
violations of his rights to freedom of speech and association
and his right to familial integrity, plaintiff asserts a due

-17-

process violation for the alleged conveyance of false
information to the Juvenile Court.  Specifically, plaintiff
contends that the DCF (he does not allege a particular
defendant) submitted a report to the Juvenile Court falsely
asserting that plaintiff's therapist had concluded that
plaintiff was unfit to see his children.  That claim is
different from plaintiff's other constitutional claims because
the knowing submission of false evidence to a court is a clear
violation of due process disqualifying the offending party from
the protection of qualified immunity. See, e.g., Hardwick v.
Cty. of Orange, 844 F.3d 1112, 1118-20 (9th Cir. 2017)
(affirming the district court's determination that government-
employed social workers were not entitled to qualified immunity
where they used perjured testimony and fabricated evidence to
support the termination of a parent's right to custody of her
child).  Nevertheless, this Court finds that the claim is barred
by the Rooker-Feldman doctrine.

    The Rooker-Feldman doctrine

    precludes federal jurisdiction over a challenge to a
    state court judgment to which the challenger was a
    party.

Miller v. Nichols, 586 F.3d 53, 59 (1st Cir. 2009) ("Rooker-
Feldman bars jurisdiction whenever parties who lost in state
court . . . seek[] review and rejection of that judgment in
federal court." (alterations in original) (internal quotation

-18-

marks omitted) (quoting <u>Puerto Ricans for P.R. Party</u> v. <u>Dalmau</u>, 544 F.3d 58, 68 (1st Cir. 2008))). The <u>Rooker-Feldman</u> doctrine also prohibits a district court from adjudicating constitutional claims that are "inextricably intertwined" with decisions made in state court proceedings. <u>Hill</u> v. <u>Town of Conway</u>, 193 F.3d 33, 39 (1st Cir. 1999). A claim is "inextricably intertwined" with a state court decision if the claim "succeeds only to the extent that the state court wrongly decided the issues before it". <u>Id.</u>

Here, plaintiff's claim appears to be that he was injured because the Juvenile Court entered an order upholding the removal of his children or the restrictions on his visitation rights on the basis of false information submitted to it by the DCF. Plaintiff was able to rebut the allegedly false evidence against him, however, because his therapist testified in that court that he had never made the statement about plaintiff's unfitness to see his children. Plaintiff does not demonstrate that the Juvenile Court made its removal and custody determination on the basis of fabricated evidence. The viability of his claim depends, therefore, on the conclusion that the Juvenile Court wrongly concluded that there was sufficient evidence to warrant the removal and continued separation of his children. Because that claim succeeds only to the extent that the Juvenile Court's decision on removal and continued separation was wrong, it is inextricably intertwined

-19-

with the state court proceedings and thus barred by the <u>Rooker-Feldman</u> doctrine.

### E.  Failure to State a Claim

Finally, plaintiff's claims for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and M.G.L. c. 119, § 29C will be dismissed because he has failed to state a claim with respect to those statutes.  First, to state a claim under Section 504 of the Rehabilitation Act for discrimination on the basis of disability under a program receiving federal funds, plaintiff must demonstrate that his child was intentionally discriminated against <u>because</u> he was disabled. <u>See</u> <u>Lesley</u> v. <u>Hee Man Chie</u>, 250 F.3d 47, 53 (1st Cir. 2001). Plaintiff has alleged absolutely no facts to support an inference that defendants initiated the child abuse investigation or judicial proceedings because of "C"'s alleged learning disability, but rather the facts alleged indicate they were initiated because of the allegations of abuse. <u>Cf.</u> <u>Lebron</u> v. <u>Commonwealth of P.R.</u>, 770 F.3d 25, 31 (1st Cir. 2014) (affirming the dismissal of claims under Section 504 of the Rehabilitation Act because the plaintiffs "provided no factual allegations that would support any inference, let alone a reasonable one, that the Commonwealth or any of its agents intentionally discriminated against the child because he was disabled").

Second, M.G.L. c. 119, § 29C does not contain a private cause of action and thus plaintiff must show that the Legislature intended an implied private cause of action. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 68 (1st Cir. 2002) (noting the "presumption against reading an implied right of action into a statute"). Plaintiff has not shown that the Massachusetts Legislature intended to authorize such a cause of action. In fact, the language of the statute is directed to the courts which make the determination of whether "reasonable efforts" have been made before granting custody of the child to the DCF and the Supreme Judicial Court, in interpreting that provision, never mentions a private action for monetary damages as a vehicle for enforcing the statute. See Care & Prot. of Walt, 84 N.E.3d 803, 817-19 (Mass. 2017) (holding that where the DCF has been awarded temporary custody after failing to fulfill its duty to make reasonable efforts to prevent or eliminate the need for removal, a judge has the equitable authority to order the DCF to take reasonable measures to remedy the adverse consequences of that breach of duty). Because plaintiff has not demonstrated that the Legislature intended an implied cause of action under M.G.L. c. 119, § 29C, the claim asserted thereunder will be dismissed for failure to state a claim.

Finally, because all of plaintiff's substantive allegations fail on jurisdictional grounds or for failure to state a claim,

his claims for declaratory and injunctive relief will also be dismissed.

## ORDER

For the foregoing reasons,

1) plaintiff's sealed motion to impound or seal the information contained in the original complaint (Docket No. 2) is **DENIED as moot;** and

2) defendants' motion to dismiss the amended complaint (Docket No. 17) is **ALLOWED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated July 17, 2019